IN THE SUPREME COURT OF NORTH CAROLINA

 2022-NCSC-16

 No. 467A20

 Filed 11 February 2022

 STATE OF NORTH CAROLINA

 v.
 RAFAEL ALFREDO PABON

 Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of

 the Court of Appeals, 273 N.C. App. 645 (2020), finding no prejudicial error in

 judgments entered on 14 December 2018 by Judge Christopher W. Bragg in Superior

 Court, Cabarrus County. On 15 December 2020, the Supreme Court allowed

 defendant’s petition for discretionary review of an additional issue pursuant to

 N.C.G.S. § 7A-31. Heard in the Supreme Court on 9 November 2021.

 Joshua H. Stein, Attorney General, by Jeffrey B. Welty, Special Deputy
 Attorney General, for the State-appellee.

 George B. Currin, for defendant-appellant.

 HUDSON, Justice.

¶1 Here we consider whether defendant was prejudiced by the trial court’s

 admission of certain testimony that we assume without deciding violated the

 Confrontation Clause of the Sixth Amendment and Rule 404(b) of the North Carolina

 Rules of Evidence. Because we conclude that even assuming there was error,

 defendant was not prejudiced, we modify and affirm the ruling of the Court of
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 Appeals.

 I. Factual and Procedural Background

 A. Trial

¶2 On 23 January 2017, a Cabarrus County grand jury indicted defendant Rafael

 Pabon for the second-degree forcible rape and first-degree kidnapping of Samantha

 Camejo-Forero (Forero). On 6 March 2017, superseding indictments were issued for

 the same charges. Beginning on 4 December 2018, defendant was tried by a jury in

 Superior Court, Cabarrus County, with Judge Christopher W. Bragg presiding.

¶3 At trial, the State’s evidence tended to show as follows: Defendant first met

 Forero in November 2015 to discuss a roof repair warranty. At the time, Forero

 worked “flipping houses” in the Charlotte area, and defendant worked as a

 construction contractor. After their initial meeting, defendant and Forero

 communicated periodically via text or phone call about work projects, their

 professions, and their families. Defendant was married and had a daughter; Forero

 was unmarried and had a son. Forero testified that she developed a friendship with

 defendant and that they would occasionally get together for lunch or coffee.

¶4 On the morning of 4 January 2017, defendant and Forero planned to get

 breakfast together. Forero testified that she had recently purchased a house and

 wanted to see if defendant could help her find a painter. Shortly after 8:30am,

 defendant picked Forero up at her house in Matthews. Defendant
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 had―unprompted―brought Forero a latte, which he handed to her to drink. Very

 quickly after starting to drink the latte, Forero began “feeling weird.” Forero testified

 feeling as if “you were in a movie[,] like . . . it wasn’t your body but you know you’re

 there but you’re not.” Forero began having difficulty moving and could not think

 clearly.

¶5 After driving for around forty-five minutes from Matthews to Concord,

 defendant and Forero arrived at a Denny’s restaurant. Forero testified that she could

 not read the menu, had difficulty controlling her body and mind, and could not

 remember if she ate. Video surveillance footage from the Denny’s, which was played

 at trial, showed Forero slouching at the table, staring into space, struggling to put

 food into her mouth, nodding off, falling over, and having difficulty walking while

 leaving. Demekia Harold-Strod, the waitress who served defendant and Forero,

 testified that Forero looked as if she was on drugs, was moving very slowly, had her

 head down a lot, and made little or no eye contact.

¶6 After leaving Denny’s around 10:30 a.m., defendant drove Forero about thirty

 minutes away to his friend Mark Stones’s house. Defendant claimed that he needed

 to pick up Stones’s mail while Stones was out of town. Stones’ house was located in a

 secluded, wooded area without any close neighbors. When defendant and Forero

 entered the house, Forero sat on a couch. Forero testified that defendant then sat

 next to her on the couch and began making unwanted sexual advances toward her,
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 including kissing and touching her, pulling up her sweater, and kissing her breast.

 Forero testified that although she did not want or consent to defendant’s advances,

 she was mentally and physically incapacitated and unable to stop them. Forero

 testified that defendant then picked her up, carried her to a nearby bedroom, and laid

 her on a bed. Defendant removed his clothes, removed Forero’s underwear, and

 continued to kiss and touch her. Forero testified that defendant then engaged in

 nonconsensual vaginal intercourse with her. Forero testified that she later walked to

 a nearby bathroom, where she saw a used condom on the floor. Afterward, defendant

 acted “like nothing happened.”

¶7 Around 12:45 p.m., defendant and Forero left Stones’s house and began driving

 back to Forero’s house. During the drive, Forero’s mother, Aura Forero de Camejo

 (Camejo), who lived with Forero, called Forero’s cell phone. Camejo testified that she

 called Forero “because [she] thought it was strange that a breakfast would have

 lasted so long.” Forero answered, and the two had a short conversation. Camejo

 testified that Forero’s speech was significantly slurred, that she had difficulty

 speaking, and that she had never sounded like that before. Forero did not remember

 talking to Camejo. Forero still could “not feel anything” and “didn’t feel [herself].” She

 could not remember most of the drive home.

¶8 Around 1:30 p.m., defendant dropped Forero back off at her home. Camejo

 testified that upon arriving, Forero was very pale, was swaying as she walked, and
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 “looked like a zombie or a dead person.” Forero immediately threw herself onto

 Camejo’s bed and went to sleep. Forero slept through an alarm at 3:10 p.m. to pick

 her son up from the bus stop and still could not get up when her son arrived home

 and began shaking her and calling for her to wake up.

¶9 Around 5:00 p.m., Forero woke up and still felt “weird[,]” “couldn’t walk

 straight[,]” and “couldn’t think.” Forero testified that “the first thing I ha[d] on my

 mind when I woke up . . . was him, it was his face all over me, and I knew what

 happen[ed].” At 5:23 p.m., Forero texted defendant to ask him what had happened

 because although she knew, she “want[ed] him to tell [her].” At 5:28 p.m., defendant

 called Forero and told her that nothing had happened—that after having breakfast

 at Denny’s he had picked up the mail at Stones’s house while she waited in the car,

 and then took her back home. After talking to defendant on the phone, Forero fell

 back asleep for the rest of the evening.

¶ 10 The next day, 5 January 2017, Forero again called defendant to ask him what

 had happened. Forero told defendant that she still did not feel well from the previous

 day and that she couldn’t remember what had happened. Defendant again claimed

 that nothing unusual had happened, that they had just eaten breakfast and went to

 Stones’s house to pick up the mail.

¶ 11 Forero then began researching online about “resources for victims of rape” and

 “how to report a rape.” She contacted the Matthews Police Department and was
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 directed to take a rape test at a hospital. She then left for the hospital “dressed the

 exact same way that she was [the] night before.”

¶ 12 Forero went to Novant Health Presbyterian Medical Center in Charlotte.

 There, Lucille Montminy, a sexual assault nurse examiner, conducted Forero’s sexual

 assault examination. During the pre-examination interview, Forero told Montminy

 that defendant had raped her the day before and recounted her memory of the events

 surrounding the rape. At trial, Montminy testified that Forero’s account of the events

 during this interview was fully consistent with Montminy’s knowledge of drug-

 assisted sexual assaults, including memory loss, confusion about the events, and

 feeling sick. During the subsequent physical examination, Montminy noted injuries

 to Forero’s vaginal area that were “indicative of a penetration injury” from a penis.

 After the physical examination, Montminy collected blood and urine samples to be

 used in subsequent testing.

¶ 13 The next day, 6 January 2017, Forero gave a formal statement to detectives at

 the Matthews Police Department, who later transferred the case to the Cabarrus

 County Sheriff’s Office. Forero granted detectives access to her phone, including her

 text messages, call records, and location data. Forero also provided detectives a hair

 sample to be used in subsequent testing.

¶ 14 At trial, the State presented testimony from two forensic toxicologists involved

 in the testing and analysis of Forero’s biological samples: Frank Lewallen and Dr.
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 Ernest Lykissa. Frank Lewallen was the forensic scientist manager at the Triad

 Regional Laboratory of the North Carolina State Crime Laboratory, located in

 Greensboro. Lewallen testified that his lab analyzed samples of Forero’s blood and

 urine collected on 5 January 2017 during the sexual assault examination. Lewallen

 specified that he did not personally perform any of the testing of Forero’s samples;

 rather, the testing was performed by two other forensic toxicologists, Brian Morse

 and Megan Deitz, and Lewallen subsequently reviewed their analysis. Lewallen

 noted that at the time of trial, Morse and Deitz were attending a training in Indiana.

¶ 15 Lewallen testified that while the initial screening of Forero’s blood samples

 screened negative for drugs or alcohol, the initial screening of her urine sample

 revealed “a positive indication for Amphetamine and Methylenedioxyamphetamine

 and for Benzodiazepines.” Next, Lewallen testified that a subsequent confirmatory

 analysis test performed by Deitz again detected these results. Specifically, the

 following exchange took place regarding Lewallen’s review of Deitz’s confirmatory

 testing:

 [Prosecutor]: So was this test performed in accordance with
 the state crime lab operating procedures?

 [Defense Counsel]: Objection. Hearsay and confrontation.

 THE COURT: Overruled.

 [Lewallen]: Yes, ma’am, it was.

 [Prosecutor]: And were you able to personally review all of
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 the data that the test produced?

 [Defense Counsel]: Objection. Hearsay and confrontation.

 THE COURT: Overruled.

 [Lewallen]: Yes, ma’am, I was.

 [Prosecutor]: Okay. Were you able to form an opinion about
 that test?

 [Defense Counsel]: Objection. Hearsay and confrontation.

 THE COURT: Overruled.

 [Lewallen]: Yes, ma’am, I was.

 [Prosecutor]: What was the result of that test?

 [Defense Counsel]: Objection. Hearsay and confrontation.

 THE COURT: Overruled.

 [Lewallen]: For the blood, no substances were found
 present in the blood sample. In the urine sample, 7-
 aminoclonazepam was detected.

 [Prosecutor]: And what is 7-aminoclonazepam?

 [Lewallen]: That is a biological metabolite or breakdown
 product of Clonazepam[,] which is a Benzodiazepine.

¶ 16 Lewallen then explained that Clonazepam is an anticonvulsant drug with

 potential side effects including decreased pulse, decreased blood pressure,

 drowsiness, dizziness, sedation, muscular incoordination, and amnesia. Lewallen

 testified that a person who ingests Clonazepam could be significantly impaired,
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 including not remembering events, experiencing a dreamlike state, and exhibiting

 speech impairment. Lewallen further noted that Clonazepam “has been documented

 to be used in [drug-facilitated sexual assault] cases.”

¶ 17 The State also presented testimony from Dr. Lykissa. Dr. Lykissa was the

 director of ExperTox Laboratories in Houston, Texas, which analyzed Forero’s hair

 sample. After testing the hair sample, Dr. Lykissa determined that Forero’s hair

 contained significant levels of Cyclobenzaprine, a muscle relaxant. Lykissa testified

 that, as a muscle relaxant, Cyclobenzaprine “floods the brain with serotonin,” the

 neurotransmitter that causes sleep. Lykissa noted that, in excess, Cyclobenzaprine

 could “numb you to death[,]” and that drugs of this type “ha[ve] been known for a lot

 of overdoses out there.”

¶ 18 In addition to his testimony regarding the hair analysis, Dr. Lykissa confirmed

 that the State Crime Lab found Clonazepam in Forero’s urine sample. Dr. Lykissa

 testified that, if ingested together, Cyclobenzaprine and Clonazepam can have a

 “[s]ynergistic effect” resulting in “[v]ery serious impairment of [the person’s] mental

 and physical faculties.” These effects would likely be intensified, Lykissa testified, by

 a combination of the drugs with caffeine. Lykissa testified that a mix of these types

 of drugs are common in drug-facilitated sexual assaults, and that Forero’s symptoms

 were consistent with such a combination.

¶ 19 The State also presented testimony from Kari Norquist, a former forensic
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 scientist at the State Crime Lab. Norquist testified that she conducted a DNA

 analysis of Forero’s rape test samples, including a swab from Forero’s breast.

 Norquist determined that there were substantial amounts of defendant’s DNA on

 Forero’s breast swab and that the amount of defendant’s DNA present was not

 common from a “casual transfer.”

¶ 20 After Norquist, the State sought to present testimony from two of defendant’s

 sisters-in-law: Chanel Samonds and Elise Weyersberg. In a voir dire hearing outside

 the presence of the jury, Samonds and Weyersberg both testified that defendant had

 previously sexually assaulted them. Based on the voir dire testimony and the

 arguments by the State and defense counsel, the trial court determined that Samonds

 and Weyersberg ’s testimony was admissible under Rule 404(b) of the North Carolina

 Rules of Evidence as tending to illustrate intent and a common scheme or plan. The

 court further determined that the danger of unfair prejudice from the testimony did

 not substantially outweigh its probative value and that the testimony was therefore

 also admissible under Rule 403. Finally, the trial court informed counsel that it would

 provide the jury with a limiting instruction regarding their testimony. With these

 preliminary issues resolved, the State was allowed to present Samonds’s and

 Weyersberg ’s testimony to the jury.

¶ 21 Samonds, the wife of defendant’s brother-in-law, testified first. Samonds

 testified that defendant raped her on 8 September 2008. Specifically, Samonds
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 testified that defendant came to her house, began making unwanted sexual advances

 while the two sat on the couch, and engaged in forcible, nonconsensual vaginal

 intercourse after Samonds repeatedly told him to stop. On cross-examination,

 Samonds testified that defendant was not prosecuted for this alleged rape.

¶ 22 Weyersberg, the sister of defendant’s wife, testified next. Weyersberg testified

 that in 2006 or 2007, when she was nineteen or twenty years old, defendant made

 several unwanted sexual advances towards her while she lived at her parent’s house.

 Weyersberg testified that during the first incident defendant came up behind her,

 started rubbing her shoulders, and began moving toward her breasts. When

 Weyersberg walked away, defendant followed and began rubbing her shoulders

 again. During this incident, defendant “was telling [Weyersberg] about how he had

 an orgy in Bolivia[,]” which made her “very uncomfortable.” On a different occasion,

 when Weyersberg was alone downstairs in her parent’s house, defendant asked her

 if she wanted to use massage oils with him and tried putting his hand up her pant

 leg. Weyersberg testified that defendant finally stopped when she went upstairs to

 her room.

¶ 23 After both Samonds’s and Weyersberg ’s testimony, the trial court gave the

 jury the following instruction:

 [T]he testimony of [the witness] is received solely for the
 purpose of showing that the defendant had the intent
 which is a necessary element of the crime charged in this
 case[,] and/or that there existed in the mind of the
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 defendant a plan, scheme, system, or design involving the
 crime charged in this case. If you believe this evidence, you
 may consider it but only for the limited purpose for which
 it was received. You may not consider it for any other
 purpose.

¶ 24 After the State completed its evidentiary showing, defendant testified in his

 own defense. Defendant claimed that he and Forero had a romantic relationship

 beyond a common friendship. Regarding the events of 4 January 2017, defendant

 testified that he and Forero went to breakfast at Denny’s, stopped at Stones’s house,

 and engaged in consensual sexual activity short of intercourse at Stones’s house.

 Regarding Forero’s abnormal state of mind and body that day, defendant suggested

 that perhaps Forero had a virus, but conceded that he “did not [know] at the time.”

¶ 25 On 14 December 2018, the jury found defendant guilty of second-degree forcible

 rape and first-degree kidnapping. The trial court sentenced defendant to consecutive

 terms of 104 to 185 months’ imprisonment for the rape conviction and 104 to 137

 months’ imprisonment for the kidnapping conviction. Based on the rape conviction,

 the trial court ordered defendant to enroll in lifetime satellite-based monitoring upon

 his release from imprisonment. Defendant timely appealed.

 B. Court of Appeals

¶ 26 On appeal, defendant alleged seven trial court errors: (1) that the trial court

 erred when it denied his motions to dismiss; (2) that the trial court erred when it

 admitted 404(b) evidence of alleged prior wrongs; (3) that the trial court erred when
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 it admitted expert testimony in violation of the Confrontation Clause; (4) that the

 indictments were facially invalid; (5) that the trial court erred when it failed to

 properly instruct the jury; (6) that the trial court erred when it allowed the jury to

 consider evidence of aggravating factors; and (7) that the trial court erred when it

 ordered defendant to enroll in satellite-based monitoring.

¶ 27 On 6 October 2020, the Court of Appeals filed an opinion rejecting each of

 defendant’s arguments and “find[ing] that [d]efendant received a fair trial free of

 prejudicial error.” State v. Pabon, 273 N.C. App. 645, 671 (2020). Specifically, two of

 the seven issues raised by defendant are pertinent to this appeal.

¶ 28 First, the Court of Appeals rejected defendant’s argument that the trial court

 erred in admitting the testimony of Lewallen in violation of the Confrontation Clause

 of the Sixth Amendment. Id. at 661. Defendant argued that “Lewallen failed to

 provide an independent opinion regarding the testing and analysis of [Forero]’s blood

 and urine samples because both tests were performed by two nontestifying forensic

 toxicologists.” Id. Defendant further asserted that because the nontestifying experts

 were not unavailable to testify and he did not have a prior opportunity to cross-

 examine them, the admission of Lewallen’s testimony regarding the test results

 violated defendant’s rights under the Confrontation Clause. Id.

¶ 29 The Court of Appeals disagreed. Specifically, the court held that Lewallen

 “offered his own opinion, without reference to or reliance upon the opinions or
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 conclusions of the nontestifying technicians.” Id. at 666. “Thus,” the court held,

 “Lewallen’s opinion was based on his own analysis and was not merely surrogate

 testimony for an otherwise inadmissible lab report or signed affidavit certifying the

 nontestifying technician’s results.” Id. Further, because Lewallen’s independent

 expert opinion was the substantive evidence that defendant had the right to, and did

 in fact, confront through cross-examination, the court held that “[d]efendant’s

 Confrontation Clause rights were not violated, [and] the trial court did not err in

 admitting Lewallen’s expert testimony.” Id. at 667.

¶ 30 Second, the Court of Appeals rejected defendant’s argument regarding Rule

 404(b) evidence. Defendant argued that the trial court erred in admitting Samonds’s

 and Weyersberg’s testimony regarding defendant’s alleged prior sexual assaults

 under Rule 404(b). Noting that “[t]his Court has been markedly liberal in admitting

 evidence of similar sex offenses by a defendant for purposes [outlined] in Rule

 404(b)[,]” the Court of Appeals agreed with the trial court that the Samonds and

 Weyersberg testimony contained sufficient similarities with the present allegations

 to be admissible as evidence of a common plan or scheme under that rule. Id. at 659

 (second alteration in original) (quoting State v. Bagley, 321 N.C. 201, 207 (1987)).

 Specifically, the Court of Appeals highlighted three similarities between all three

 allegations: (1) “each woman testified that [d]efendant gained their trust prior to each

 incident”; (2) “[d]efendant utilized that position of trust to sexually assault each
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 woman”; and (3) “[d]efendant tried to persuade each victim that he had not sexually

 assaulted them.” Pabon, 273 N.C. App. at 659–60.

¶ 31 Regarding the temporal proximity element of Rule 404(b) analysis, the Court

 of Appeals held that “[b]ecause these acts were performed continuously over a period

 of years, the acts were not too remote to be considered for the purposes of 404(b).” Id.

 at 660. Finally, the Court of Appeals held that the trial court did not abuse its

 discretion in ruling that the probative value of the Samonds and Weyersberg

 testimony was not substantially outweighed by the danger of unfair prejudice under

 Rule 403. Id. at 661. Accordingly, the Court of Appeals held that the trial court did

 not err in admitting the State’s Rule 404(b) evidence. Id.

¶ 32 Judge Murphy dissented in part from the Court of Appeals’ majority opinion.

 While Judge Murphy concurred with the majority’s analysis regarding the motion to

 dismiss, the Rule 404(b) evidence, and the indictment, he disagreed with the

 majority’s Confrontation Clause analysis. Id. at 675 (Murphy, J., concurring in part

 and dissenting in part). Specifically, the dissent would have found that Lewallen’s

 testimony regarding the forensic reports did not provide an independent expert

 opinion but rather “simply parroted the conclusions of a test performed by another

 person not subject to the confrontation required by the United States Constitution.”

 Id. at 674–75. Accordingly, the dissent would have held that “Lewallen’s testimony

 was inadmissible and [d]efendant is entitled to a new trial free from this prejudicial
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 violation of his constitutional rights.” Id. at 675.

 C. Present Appeal

¶ 33 On 10 November 2020, defendant simultaneously gave notice of appeal based

 on the Confrontation Clause issue raised in Judge Murphy’s dissent and petitioned

 this Court for discretionary review on the other issues he raised before the Court of

 Appeals. On 15 December 2020, this Court allowed defendant’s petition for

 discretionary review as to one additional issue: the admission of the Samonds and

 Weyersberg testimony under Rule 404(b).

¶ 34 Before this Court, defendant asserts that the trial court committed two

 prejudicial errors: (1) overruling his Confrontation Clause objections to the testimony

 of Lewallen regarding the tests performed by a nontestifying chemical analyst; and

 (2) overruling his objections to the Rule 404(b) testimony of Samonds and

 Weyersberg.

¶ 35 First, defendant argues that the trial court erred in overruling his

 Confrontation Clause objections to the testimony of Lewallen, the State’s expert from

 the State Crime Lab, regarding the forensic tests performed by a nontestifying

 chemical analyst. In alignment with the Court of Appeals dissent, defendant argues

 that Lewallen did not provide an independent opinion as to the presence of the

 Clonazepam in Forero’s urine sample but merely parroted the results of the test of a

 nontestifying analyst. Further, defendant alleges that this error was prejudicial
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 because Lewallen’s testimony regarding the presence of Clonazepam in Forero’s urine

 sample was “crucial to the State’s case.” Specifically, defendant contends that because

 the State emphasized the “synergistic effect of mixing the two drugs and how this

 mixture would cause very serious impairment of a person’s mental and physical

 faculties[,] . . . the State would have been hard pressed to prove its case” in the

 absence of Lewallen’s testimony.

¶ 36 Second, defendant argues that the trial court erred in overruling his objections

 to the Rule 404(b) testimony of Samonds and Weyersberg. Defendant asserts that the

 Samonds and Weyersberg testimony fall short of both requirements of Rule 404(b):

 sufficient similarity and temporal proximity. Regarding the first requirement,

 defendant argues that any similarities between the alleged prior bad acts and the

 crimes for which he was charged were too generic in light of the stark dissimilarities

 between the alleged acts to be considered admissible. Regarding the second

 requirement, defendant argues that the elapsed time between the alleged prior bad

 acts and the current charges—eight and one-half years and ten years, respectively—

 renders them too attenuated to reasonably suggest intent or any common scheme or

 plan. Finally, defendant asserts that the trial court’s erroneous admission of the

 Samonds and Weyersberg testimony was prejudicial because “[t]here was not

 overwhelming evidence of [d]efendant’s guilt and [d]efendant testified at trial and

 denied [Forero]’s allegations.” Rather, defendant contends that the case boiled down
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 to a “credibility contest” between him and Forero, and that the improper admission

 of the Samonds and Weyersberg testimony of alleged prior sexual assaults therefore

 prejudicially bolstered Forero’s credibility with the jury while undermining his own.

¶ 37 In response, the State contends that neither the Confrontation Clause issue

 nor the Rule 404(b) issue amounted to trial court error, and even assuming they did,

 neither error would be prejudicial. Regarding the first issue, the State argues that

 Lewallen’s testimony offered his independent expert opinion on the forensic analysis,

 therefore complying with the requirements of the Confrontation Clause. Regarding

 the second issue, the State argues that the Samonds and Weyersberg testimony, for

 the reasons expressed by the Court of Appeals, was both sufficiently similar and

 temporally proximate to the present charges to be properly admitted under Rule

 404(b). In any event, the State argues, even assuming that these issues constituted

 errors, neither would be prejudicial. The State contends that even without the

 testimony in question, “[i]n light of the supporting testimony and physical evidence,

 no reasonable juror would have been left with the impression that . . . [d]efendant’s

 version of events was truthful.”

 II. Analysis

¶ 38 After careful consideration, we assume, without deciding, that the trial court

 erred on both the Confrontation Clause issue and the Rule 404(b) issue, but

 nevertheless determine that neither assumed error was prejudicial.
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 A. Confrontation Clause: Independent Expert Opinion Testimony

¶ 39 First, we consider defendant’s Confrontation Clause claim. This Court reviews

 alleged constitutional errors in the admission of testimony in violation of the

 Confrontation Clause de novo. State v. Ortiz-Zape, 367 N.C. 1, 10 (2013).

¶ 40 The Sixth Amendment to the United States Constitution establishes that “[i]n

 all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

 the witnesses against him[.]” U.S. Const. amend VI. This “bedrock procedural

 guarantee applies to both federal and state prosecutions.” Crawford v. Washington,

 541 U.S. 36, 42 (2004) (citing Pointer v. Texas, 380 U.S. 400, 406 (1965)). Although

 the basic theory of the right to confront one’s accusers “dates back to Roman times[,]”

 our country’s “immediate source of the concept . . . was the [English] common law.

 Crawford, 541 U.S. at 43.

¶ 41 Modern times and technologies introduced a new question to this old right: who

 does the accused have the right to confront when the “accuser” is a not a person, but

 a forensic report? In 2011, the Supreme Court of the United States answered this

 question in Bullcoming v. New Mexico. 564 U.S. 647 (2011). There, the principal

 evidence presented against defendant Donald Bullcoming in his trial for driving while

 intoxicated was “a forensic laboratory report certifying that [his] blood-alcohol

 concentration was well above the [legal] threshold.” Id. at 651. “At trial, the

 prosecution did not call as a witness the analyst who signed the certification. Instead,
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 the State called another analyst who was familiar with the laboratory’s testing

 procedures, but had neither participated in nor observed the test on Bullcoming’s

 blood sample.” Id. The Court held that this did not satisfy Bullcoming’s rights under

 the Confrontation Clause because the testifying analyst provided mere “surrogate

 testimony” without expressing any “ ‘independent opinion’ concerning Bullcoming’s

 BAC.”

¶ 42 Since Bullcoming, this Court has sought to apply this constitutional protection

 with fidelity. In Ortiz-Zape, for instance, because a forensic scientist “testified as to

 her opinion that a substance was cocaine based upon her independent analysis of

 testing performed by another analyst in her laboratory[,]” this Court held that “the

 testifying expert was the witness whom defendant had the right to confront.” 367

 N.C. 1, at 2, 12–13 (2013). Accordingly, we reversed the Court of Appeals’ holding

 that the expert’s testimony violated the Confrontation Clause. Id. at 14.

¶ 43 In State v. Craven, 367 N.C. 51, (2013), this Court reached the opposite

 conclusion on the same question where a forensic chemist who had not personally

 performed the testing of the alleged cocaine “testified about the identity, composition,

 and weight of the substances recovered” from the defendant. Id. at 54. However,

 based on a review of the testimony, this Court determined that the testifying witness

 “did not offer—or even purport to offer—her own independent analysis or opinion on

 the . . . samples. Instead, [she] merely parroted [the nontestifying analysts’]
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 conclusions from their lab reports.” Id. at 56–57. Accordingly, this Court held that

 the testifying expert’s “surrogate testimony violated defendant’s Sixth Amendment

 right to confrontation.” Id. at 57.

¶ 44 When a Confrontation Clause violation is established, the reviewing court

 must then “determine if the admission of [the offending] evidence . . . was such

 prejudicial error as to require a new trial.” State v. Watson, 281 N.C. 221, 232 (1972).

 “A violation of the defendant’s rights under the Constitution of the United States is

 prejudicial unless the appellate court finds that it was harmless beyond a reasonable

 doubt.” N.C.G.S. § 15A-1443(b). “The burden is upon the State to demonstrate,

 beyond a reasonable doubt, that the error was harmless.” N.C.G.S. § 15A-1443(b). If

 it does so, the jury’s verdict is not disturbed on appeal, in spite of a Confrontation

 Clause violation. See Watson, 281 N.C. at 233 (determining that a Confrontation

 Clause error was harmless beyond a reasonable doubt).

¶ 45 Here, we assume without deciding that the trial court’s admission of

 Lewallen’s testimony regarding the results of Deitz’s confirmatory test of Forero’s

 urine sample violated defendant’s right to confrontation under the Sixth Amendment.

 However, because we conclude that this assumed error was harmless beyond a

 reasonable doubt, we modify and affirm the holding Court of Appeals finding no

 prejudicial error on this issue.

¶ 46 First, any improper testimony from Lewallen was not the only evidence of
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 Clonazepam in Forero’s urine sample. Rather, Lewallen testified about two distinct

 findings of Clonazepam in Forero’s sample: first describing the “initial” or

 “preliminary” testing, and then describing the “confirmatory” testing. As to Deitz’s

 confirmatory testing, Lewallen testified as follows:

 [Prosecutor]: What was the result of that test?

 [Defense Counsel]: Objection. Hearsay and confrontation.

 THE COURT: Overruled.

 [Lewallen]: For the blood, no substances were found
 present in the blood sample. In the urine sample, 7-
 aminoclonazepam was detected.

 [Prosecutor]: And what is 7-aminoclonazepam?

 [Lewallen]: That is a biological metabolite or breakdown
 product of Clonazepam[,] which is a Benzodiazepine.

 This quoted testimony formed the basis of defendant’s Confrontation Clause

 argument on appeal and is the testimony which we assume without deciding violated

 the Confrontation Clause.

¶ 47 As to the “initial” or “preliminary” testing, though, Lewallen testified as

 follows:

 [Prosecutor]: Okay. What opinion did you form about that
 initial screening test?

 [Defense Counsel]: Objection. Hearsay and confrontation.

 THE COURT: Overruled.
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 [Lewallen]: For the blood it was negative for all 12 assays.
 For the urine we had a positive indication for
 Amphetamine and Methylenedioxyamphetamine and for
 Benzodiazepines.

 Although defendant objected to this testimony at trial, this was not the testimony

 upon which defendant based his Confrontation Clause argument on appeal and is not

 part of any assumed error.

¶ 48 Accordingly, based on Lewallen’s testimony regarding the initial testing, even

 in the absence of his subsequent testimony regarding the confirmatory testing, there

 was still competent evidence before the jury of the presence of Clonazepam in Forero’s

 urine sample. Therefore, Dr. Lykissa’s testimony regarding the “synergistic effect” of

 the combination of both Clonazepam and Cyclobenzaprine in drug-facilitated sexual

 assaults would still have been grounded in the evidence.

¶ 49 Next, the State has demonstrated that even in the absence of any of Lewallen’s

 testimony regarding the presence of Clonazepam in Forero’s urine sample, the jury

 would still have had ample evidence of Cyclobenzaprine in Forero’s hair sample

 through Dr. Lykissa’s testimony. Although defendant correctly notes that the State

 emphasized the synergistic effect of the combination of the two drugs, Dr. Lykissa

 also testified about the potential impact of Cyclobenzaprine alone. Specifically, Dr.

 Lykissa noted that Cyclobenzaprine is a “muscle relaxant,” “it floods the brain with

 serotonin[,]” “it can numb you to death,” it “is notorious,” its effects would be

 heightened by the ingestion of caffeine, and “[i]t’s in the same family of Amitriptyline,
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 [which] has been known for a lot of overdoses out there.”

¶ 50 This evidence, even in the absence of Lewallen’s testimony regarding

 Clonazepam and the synergistic effects, still support the State’s evidence of Forero’s

 symptoms on 4 January 2017—namely dizziness, rapid decline of motor skills,

 confusion, drowsiness, memory loss, and a generally dreamlike state. Notably, these

 symptoms were not established by Lewallen’s testimony, or even by Lykissa’s, but by

 the testimony of those who observed them firsthand: Forero’s mother, the sexual

 assault nurse examiner, the Denny’s waitress, the Denny’s surveillance video, and,

 of course, Forero herself. The ample evidence of the presence of Cyclobenzaprine in

 Forero’s hair sample, the known effects of Cyclobenzaprine, and the evidence of

 Forero’s symptoms strongly supported the State’s case of drug-facilitated sexual

 assault. Accordingly, the State has demonstrated that even without Lewallen’s

 testimony, any reasonable jury would likely have reached the same conclusion based

 on the other evidence.

¶ 51 Moreover, even setting aside the assumedly improper Lewallen testimony

 would neither disturb nor undermine the other overwhelming evidence of defendant’s

 guilt. The jury was presented with extensive testimony from eighteen witnesses

 supporting the State’s theory of defendant’s actions, filling nearly one thousand

 transcript pages. The State also submitted 146 exhibits for the jury’s consideration.

¶ 52 Of course, sheer volume is not dispositive; the State has also demonstrated
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 that Forero’s testimony was extensive, detailed, and consistent, revealing numerous

 indications of drug-facilitated sexual assault. Further, her testimony was

 corroborated by that of Forero’s mother and the Denny’s waitress, who directly

 witnessed her appearance, behavior, speech, and demeanor on 4 January 2017. Next,

 a procession of highly trained and experienced medical, forensic, and law enforcement

 professionals further supported Forero’s claims, including Montminy (the sexual

 assault nurse examiner), Norquist (the rape kit examiner), Dr. Lykissa, Detective

 Danielle Helms (Matthews Police Department), Lieutenant Kevin Pfister (Cabarrus

 County Sheriff’s Office), and Detective Sergeant April Samples (Cabarrus County

 Sheriff’s Office), among several others. Finally, the State’s exhibits were also potent

 and corroborative, particularly the Denny’s surveillance video, Dr. Lykissa’s report,

 the rape kit evidence, and the DNA evidence. In considering this overwhelming

 evidence against defendant, we conclude that the State met its burden of

 demonstrating that, even assuming that the admission of the Lewallen testimony

 was erroneous, “the minds of an average jury would not have found the [remaining]

 evidence less persuasive had the [erroneous] evidence . . . been excluded.” Watson,

 281 N.C. at 233. As such, any Confrontation Clause error was harmless beyond a

 reasonable doubt.

¶ 53 Defendant’s attempts to undermine the State’s demonstration of no prejudice

 are unavailing. Specifically, defendant asserts that “[t]he prejudice . . . is manifest as
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 th[e] improperly admitted evidence was crucial to the State’s case.” Defendant

 contends that because the State emphasized the “synergistic effects” of combining

 Clonazepam and Cyclobenzaprine, “it is obvious that without Lewallen’s inadmissible

 testimony . . . , the State would have been hard pressed to prove its case.”

¶ 54 We cannot agree. As noted above: (1) other portions of Lewallen’s testimony

 also established his opinion that Clonazepam was detected in Forero’s urine sample;

 (2) Lykissa’s testimony independently established the presence of another drug

 common in drug-facilitated sexual assaults in Forero’s hair sample; and (3) the State

 presented other overwhelming testimony and evidence tending to prove defendant’s

 guilt.

¶ 55 Defendant presented eight witnesses and thirteen exhibits to support his claim

 that he and Forero had a romantic relationship and had engaged in consensual sexual

 activity short of intercourse. In response to the overwhelming evidence of Forero’s

 incapacitation, defendant suggested that Forero may have had a virus, but then

 conceded that he “did not [know] at the time.” Defendant’s evidence did not address

 Montminy’s finding of vaginal injuries consistent with penetration from a penis, did

 not undermine Dr. Lykissa’s forensic report, and did not provide an alternative

 explanation as to why Forero might have had Cyclobenzaprine in her system when

 she was not taking any medications at the time.

¶ 56 To be clear, defendant, like all criminal defendants, enjoyed a presumption of
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 innocence until proven guilty by the State beyond a reasonable doubt, and therefore

 was not required to put forth any testimony or evidence whatsoever. Likewise, the

 burden of demonstrating a lack of prejudice beyond a reasonable doubt upon a

 constitutional error lies with the State, and defendant was not required to

 affirmatively demonstrate prejudice on this issue. But the State’s voluminous and

 comprehensive evidence of defendant’s guilt amply satisfies its burden.

¶ 57 As shown through its verdict, this evidence persuaded the jury beyond a

 reasonable doubt that defendant committed the second-degree forcible rape and first-

 degree kidnapping of Forero on 4 January 2017. Although the assumedly erroneous

 Lewallen testimony confirmed the presence of Clonazepam in Forero’s urine sample

 and emphasized the potential “synergistic effects” of the combination of Clonazepam

 and Cyclobenzaprine, its admission does not require a new trial, in light of the

 overwhelming nature of the remaining evidence. Accordingly, we modify and affirm

 the holding of the Court of Appeals finding no prejudicial error on this issue.

 B. Rule 404(b): Evidence of Prior Bad Acts

¶ 58 Second, we consider defendant’s Rule 404(b) claim.

 When the trial court has made findings of fact and
 conclusions of law to support its 404(b) ruling, . . . we look
 to whether the evidence supports the findings and whether
 the findings support the conclusions. We review de novo
 the legal conclusion that the evidence is, or is not, within
 the coverage of Rule 404(b).

 State v. Beckelheimer, 366 N.C. 127, 130 (2012).
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

¶ 59 Rule 404(b) of the North Carolina Rules of Evidence establishes that:

 Evidence of other crimes, wrongs, or acts is not admissible
 to prove the character of a person in order to show that he
 acted in conformity therewith. It may, however, be
 admissible for other purposes, such as proof of motive,
 opportunity, intent, preparation, plan, knowledge,
 identity, or absence of mistake, entrapment or accident.

 N.C.G.S. § 8C-1, Rule 404(b) (2021).

¶ 60 Generally, Rule 404 acts as a gatekeeper against “character evidence”:

 evidence of a defendant’s character—as illustrated through either direct testimony or

 evidence of prior bad acts—admitted “for the purpose of proving that he acted in

 conformity therewith on a particular occasion.” N.C.G.S. § 8C-1, Rule 404(a). It has

 long been observed that character evidence “is objectionable not because it has no

 appreciable probative value but because it has too much. The natural and inevitable

 tendency of the tribunal—whether judge or jury—is to give excessive weight to the

 vicious record of crime thus exhibited and either to allow it to bear too strongly on

 the present charge or to take the proof of it as justifying a condemnation, irrespective

 of the accused’s guilt of the present charge.” John Henry Wigmore, Evidence § 58.2

 (Peter Tillers ed. 1983). Accordingly, Rule 404(b) evidence “should be carefully

 scrutinized in order to adequately safeguard against the improper introduction of

 character evidence against the accused.” State v. Al-Bayyinah, 356 N.C. 150, 154

 (2002).

¶ 61 This important protective role notwithstanding, this Court has repeatedly held
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 that “Rule 404(b) state[s] a clear general rule of inclusion.” State v. Coffey, 326 N.C.

 268, 278–79 (1990); see Al-Bayyinah, 356 N.C. at 153–54 (quoting Coffey for this same

 proposition). That is, relevant evidence of past crimes, wrongs, or acts by a defendant

 are generally admissible for any one or more of the purposes enumerated in Rule

 404(b)’s non-exhaustive list, “subject to but one exception requiring its exclusion if its

 only probative value is to show that the defendant has the propensity or disposition

 to commit an offense of the nature of the crime charged.” Coffey, 326 N.C. at 279

 (emphasis in original); see Beckelheimer, 366 N.C. at 130 (noting that “[Rule 404(b)’s]

 list ‘is not exclusive, and such evidence is admissible as long as it is relevant to any

 fact or issue other than the defendant’s propensity to commit the crime’ ” (quoting

 State v. White, 340 N.C. 264, 284 (1995))).

¶ 62 Rule 404(b) has particular salience in trials for sexual offenses. On the one

 hand, “this Court has been markedly liberal in admitting evidence of similar sex

 offenses by a defendant.” State v. Bagley, 321 N.C. 201, 207 (1987) (quoting State v.

 Cotton, 318 N.C. 663, 666 (1987)). On the other hand, though, the high potency of

 prior sex offense testimony brings a correspondingly high risk of improper sway upon

 the jury’s determination. See State v. Gray, 210 N.C. App. 493, 521 (2011) (noting

 that “[t]he improper admission of a prior sexual assault by a defendant tends to

 bolster an alleged victim’s testimony that an assault occurred and that the defendant

 was the perpetrator, since such evidence informs the jury that the defendant has
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 committed sexual assault in the past.”); State v. McClain, 240 N.C. 171, 174 (1954)

 (noting that “[p]roof that a defendant has been guilty of another crime equally

 heinous prompts to a ready acceptance and belief in the prosecution’s theory that he

 is guilty of the crime charged. Its effect is to predispose the mind of the juror to believe

 the [defendant is] guilty, and thus effectually to strip him of the presumption of

 innocence.”).

¶ 63 In order to navigate this terrain, this Court has looked toward the useful

 guidance of twin north stars: similarity and temporal proximity. See Al-Bayyinah,

 356 N.C. at 154 (“To effectuate these important evidentiary safeguards, the rule of

 inclusion described in Coffey is constrained by the requirements of similarity and

 temporal proximity.”). Regarding the first, prior acts are considered sufficiently

 similar under Rule 404(b) “ ‘if there are some unusual facts present in both crimes’

 that would indicate that the same person committed them.” Beckelheimer, 366 N.C.

 at 131 (quoting State v. Stager, 329 N.C. 278, 304 (1991)). While these similarities

 must be specific enough to distinguish the acts from any generalized commission of

 the crime, “[w]e do not require that [they] ‘rise to the level of the unique and bizarre.”

 Beckelheimer, 366 N.C. at 131 (quoting State v. Green, 321 N.C. 594, 604, cert. denied,

 488 U.S. 900 (1988)). Regarding the second, while a greater lapse in time between the

 prior and present acts generally indicate a weaker case for admissibility under Rule

 404(b), see, e.g., Jones, 322 N.C. at 586, 591 (holding that admission of Rule 404(b)
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 testimony of a prior sexual assault that took place “some seven years before in much

 the same manner as the [allegations] in the case sub judice” was “prejudicial to the

 defendant’s fundamental right to a fair trial on the charges for which he was indicted

 because the prior acts were too remote in time”), “remoteness for purposes of 404(b)

 must be considered in light of the specific facts of each case[,] . . . [and t]he purpose

 underlying the evidence also affects the analysis.” Beckelheimer, 366 N.C. at 132

 (cleaned up).

¶ 64 Finally, if an appellate court reviewing a trial court’s Rule 404(b) ruling

 determines in accordance with these guiding principles that the admission of the Rule

 404(b) testimony was erroneous, it must then determine whether that error was

 prejudicial. See Scott, 331 N.C. at 46 (engaging in prejudice analysis after finding

 Rule 404(b) error). In accordance with N.C.G.S. § 15A-1443(a), “[t]he test for

 prejudicial error is whether there is a reasonable possibility that, had the error not

 been committed, a different result would have been reached at trial.” Id. “The burden

 of showing such prejudice . . . is upon the defendant.” N.C.G.S. § 15A-1443(a).

 Notably, while for the reasons noted above there is a “high potential for prejudice

 inherent in the introduction of evidence of prior [sex] offenses,” such evidence is not

 prejudicial per se. Scott, 331 N.C. at 46 (emphasis added).

¶ 65 Here, as in the Confrontation Clause analysis above, we assume without

 deciding that the Samonds and Weyersberg testimony was erroneously admitted
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 under Rule 404(b). However, because we conclude that this assumed error was not

 prejudicial, we modify and affirm the ruling Court of Appeals finding no prejudicial

 error on this issue.

¶ 66 In determining whether a Rule 404(b) error creates “a reasonable possibility

 that, had the error not been committed, a different result would have been reached

 at trial[,]” the burden of demonstrating prejudice lies with defendant. Id.; see

 N.C.G.S. § 15A-1443(a). Here, after careful consideration, we conclude that defendant

 has failed to demonstrate a reasonable possibility that the jury would have reached

 a different verdict if the Samonds and Weyersberg testimony had been excluded at

 trial.

¶ 67 In his arguments regarding Rule 404(b) prejudice, defendant asserted that

 “[t]here was not overwhelming evidence of [d]efendant’s guilt.” “Rather,” defendant

 claimed, “this case boiled down to” a credibility contest: “the credibility of the

 prosecuting witness . . . versus the credibility of [d]efendant.” “Given th[is] lack of

 overwhelming evidence and the central importance of the credibility of [d]efendant

 versus the credibility of [Forero],” defendant argued, “the erroneous admission of the

 prior bad acts evidence . . . was highly prejudicial.”

¶ 68 We cannot agree. In a simple “credibility contest,” there is little or no physical

 or corroborating evidence of the incident in question, leaving the competing stories of

 the two internal participants and whom to believe as the only real question for the
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 factfinder. In such an instance, any evidence of prior acts that tends to bolster or

 undermine the credibility of one of the primary participants may be particularly

 influential in the ultimate outcome. See, e.g., Scott, 331 N.C. at 46 (determining that

 the erroneous admission of testimony regarding a prior sexual assault allegation was

 prejudicial when the “[b]oth the State’s evidence and the defendant’s were

 corroborated to some extent by the testimony of other witnesses”).

¶ 69 That is plainly not the case here. Although defendant and Forero did present

 two contrasting stories about the events of 4 January 2017, Forero’s version of the

 events was then corroborated by extensive supporting external testimony and

 evidence. As discussed in more detail above, this corroborating evidence included:

 Camejo and Harold-Strod’s testimony regarding Forero’s apparent incapacitation;

 surveillance video footage demonstrating this incapacitation; Montminy’s testimony

 regarding Forero’s description of the alleged rape during the sexual assault

 examination; Montminy’s testimony regarding Forero’s vaginal injury consistent

 with penetration by a penis; subsequent DNA testing of the rape kit; Detective

 Helms’s testimony regarding her interview with Forero and subsequent

 investigation; Lieutenant Pfister’s testimony regarding his review of the evidence and

 investigation of the scene of the alleged crime; Detective Samples’ testimony

 regarding the investigation process; and Dr. Lykissa’s testimony regarding the

 presence of a drug common in drug-facilitated sexual assaults in Forero’s hair sample,
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

 among other testimony and evidence. We see this case not as simply a “credibility

 contest,” but as one with overwhelming evidence of defendant’s guilt.

¶ 70 It is within the context of this overwhelming evidence that we must consider

 the relative impact of the Samonds and Weyersberg testimony alleging past sexual

 assault. By the time Samonds and Weyersberg shared their allegations with the jury,

 Dr. Lykissa, Montminy, Camejo, Norquist, Detective Helms, Harold-Strod, and

 Lieutenant Pfister, among others, had already corroborated Forero’s testimony, with

 additional supporting testimony to come later. Under these circumstances, we cannot

 conclude that a reasonable possibility exists that the jury would have reached a

 different verdict but for the assumedly erroneous admission of the Samonds and

 Weyersberg testimony. Accordingly, defendant has failed to meet his burden of

 showing prejudice, and we modify and affirm the holding of the Court of Appeals

 finding no prejudicial error on this issue.

 III. Conclusion

¶ 71 Assuming without deciding that the trial court’s admission of the Lewallen

 testimony violated defendant’s rights under the Confrontation Clause and that the

 Samonds and Weyersberg testimony violated Rule 404(b) of North Carolina Rules of

 Evidence, we nevertheless conclude that these assumed errors were not prejudicial.

 Regarding the Lewallen testimony, the State has met its burden under N.C.G.S. §

 15A-1443(b) of demonstrating that the assumed Confrontation Clause error was
 STATE V. PABON

 2022-NCSC-16

 Opinion of the Court

harmless beyond a reasonable doubt. As for the Samonds and Weyersberg testimony,

defendant has failed to meet his burden under N.C.G.S. § 15A-1443(a) of

demonstrating that there is a reasonable possibility that had the assumed Rule

404(b) error not been committed, a different result would have been reached at trial.

Accordingly, we modify and affirm the holding of the Court of Appeals finding no

prejudicial error on these issues.

 MODIFIED AND AFFIRMED.

 Justice BERGER did not participate in the consideration or decision of this

case.
 Chief Justice NEWBY concurring.

¶ 72 I concur in the portion of the majority’s opinion holding that defendant was not

 prejudiced by the alleged errors in this case. I do not, however, join the portions of

 the majority opinion that discuss defendant’s arguments regarding the trial court’s

 alleged error under the Confrontation Clause of the Sixth Amendment and N.C.G.S.

 § 8C–1, Rule 404(b). We have assumed without deciding that the trial court erred.

 Thus, discussion of the merits of these arguments is unnecessary. Tr. of Rowan Tech.

 Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N.C. 230, 242, 328 S.E.2d 274, 281

 (1985). Accordingly, I concur.